The United States Board of Appeals for the 9th Circuit is now in session. Good morning and welcome to the 9th Circuit Court of Appeals. We are ready to proceed with the oral argument for rehearing en banc in the case of Kellyanne Shachoff McDougall v. The County of Ventura. The parties are ready to proceed. We may begin. Three of my colleagues are on video and I just want to, before you start, make sure that they can hear me. Judge McEwen, good morning. Yes. Judge Friedland, good morning. Good morning. And then Judge Hurwitz. Okay, thank you very much. All right, you may begin. Thank you. Good morning. If you may please the court. Ray DiGiuseppe to the plaintiff appellants. I'd like to reserve three minutes for rebuttal if I can. Much has happened. How many minutes? Three minutes, please. Good.  The Supreme Court has reminded us of that in a series of recent cases, which have addressed the ethics of this type, where individual rights to gather in public for the practice of religious faiths were curtailed, and the court made clear that the Constitution is here to stay throughout any such pandemic. The same is true in the context of Second Amendment rights, particularly when the governmental interest is claimed as nothing more than the same general interest in preventing the spread of disease, and has nothing to do with any of the concerns about gun violence or gun misuse, which have been used to justify other Second Amendment restrictions that have previously been upheld as constitutional. So your colleague on the other side says, places significant weight on the supposed temporary nature and limited length of the ban created by the orders. Does the length of the ban go to the constitutionality of the conduct, or is it simply a reflection of the greater damages? I think that the length of the ban has some significance. It busts, but it's not controlling in that we shouldn't place too much emphasis on the temporary nature of it. We saw in the religious exercise cases that the Supreme Court's concern was on a daily basis, because they specifically said that people needed to get to church every day to pray for their worship services. It was a day-to-day concern, so the absolute length of the ban isn't controlling. It certainly has relevance to the analysis for the longer that it would persist. The greater there is necessarily in injury, but it's not dispositive that it be a certain length. Counselor? Hi. This is Judge Hurwitz. I wanted to ask you, because we're hearing a motion to dismiss, and we came up with an emotion to dismiss. What can I tell from your complaint about the nature of the burden placed on the two-name clients? It appears that one of the two-name plaintiffs was prevented for some period of time from picking up a firearm that he'd ordered, and perhaps picking up a firearm that was being prepared. How long was that restriction in place? The restriction asked to Mr. McDougall? Yes. He wouldn't have been able to acquire or obtain that firearm, which he had initiated the purchase  I'm wondering about that. The city seems to contend that there was a point in which, in order to engage in interstate commerce, people were at the county, I'm sorry, were free to go pick up, go do these things. If that's right, and we're on a motion to dismiss, and we've never had a chance to answer, is the restriction 30 days? If there were a travel exception, then we might be talking about something different, but that actually has not been specifically advocated even by... It was advocated below, so I'm just trying to figure out what the length of the restriction is. It's somewhere between 30 and 47 days. It would have been at least 30 days to get to the point where April 20th rolls around, Your Honor, because the travel restriction that was in place, or the supposed exception to travel, was for interstate commerce. It wasn't in... I know you contend that it didn't apply to this circumstance. Well, it also... Okay, look, let me just, I want to get some factual stuff straight. Can I tell from this record whether or not either of the individual plaintiffs possessed firearms during this period? So from the complaint as to Mr. McDougall, we know that he was trying to acquire a new firearm, and that he had an existing firearm, which he placed with a gunsmith and could not retrieve. Yeah, that's not what I asked. I asked, can I tell from the complaint whether or not either of the plaintiffs actually possessed firearms that they could use for lawful purposes? Sure. During the year or period you think is it effective? As to Ms. Garcia, we can tell that she did not, because it is alleged that she was desiring to obtain the necessary certifications to be able to initiate a purchase. So as to Mr. McDougall, can we tell? As to Mr. McDougall, we can tell that he at least had one other firearm, which he placed in possession of a gunsmith. Yeah, that's not what I'm asking. Let me ask you the third time and see if you can answer. Can I tell from the complaint whether other than the firearm that he hoped to pick up, that he purchased or picked up from the gunsmith, Mr. McDougall had access to firearms during the time period that you contend the orders were effective? We, that is not specifically alleged either way. Okay. Go ahead. I guess my question is, as to Mr. McDougall, let's assume he had ample access to firearms during this time period. Would that have an effect on the burden that was placed on him by the orders? It may have some effect as to him, but the burden went further than that, given that he was not able to acquire any ammunition for the firearms if he had any other than those. Can we tell from the record whether he had ammunition available to him during this time period? We cannot tell from the record in that regard. No, Your Honor. I have a follow-up question to that. This is Judge McEwen, and it really relates to the posture of the case. We're here on a 12 v. 6, and you've made the arguments in your briefing that there's no fit because the county didn't supply evidence. That sounds to me like a summary judgment posture where the county at this point, the real question it seems to me is whether you've stated a claim that would survive 12 v. 6 or not. And if we were to determine that you'd stated a claim, that doesn't necessarily mean that you would win. Wouldn't it then go back and both sides would then present evidence? And I realize each side presented some evidence, but the standard we're here is 12 v. 6, not a summary judgment. Do you agree with that? Absolutely, Your Honor. I think that's critical. Okay, so you would like the district court order to be reversed, correct? That's right, Your Honor. And in effect, when we do that, we normally, if we were to agree that you've stated enough to state a claim, then we would remand the case so both sides could present their evidence on fit and all the questions that Judge Hurwitz was asking. Is that correct? That's correct, Your Honor. So do you agree with me that at this stage, we don't need to decide whether the stay-at-home orders burden the Second Amendment and that at a minimum, we could go to what our circuit has typically done and what has been described as well-trodden in a judicious course or judicious route and just assume a burden and go from there? Do you agree with that analysis based on Ninth Circuit precedent? I think you could make such an assumption. Of course, we contend that that's clearly true, but that you could follow that well-trodden path of the Ninth Circuit and make that assumption and move on from the analysis there. Yes, Your Honor. And then you could determine whether, based on the nature of the restriction, it falls, for example, in virtually every other case we've had, intermediate scrutiny and leaves to the District Court to match that with whatever facts both sides might present, correct? That's correct, Your Honor. And it sort of segues to another interesting point with the pending action at the Supreme Court level in Bruin where we're about to have that opinion come down. It may or may not impact the analysis, but if this were back before the District Court, the District Court could consider in the first instance, in light of additional facts that may be produced and then leading to probably a summary judgment process, but to what extent Bruin may impact the analysis in that regard in light of whatever facts may be developed. But you're right. It's critical that we are on the 12B6 posture, so we're focusing on whether the allegation taken, the allegations taken, is true and construed most favorably to the plaintiffs in the complaint. The State applauds the case for a Second Amendment violation. Okay. I have just one last question, if I might. In light of our Court's recent decision in Brecht and mootness of certain claims, it would seem to me that claims other than the damages claim would be moot at this juncture. Is that correct or not? Well, the nominal damages claim definitely does go to the past constitutional injury, which by itself keeps the case alive as to what's already happened. That's for sure. I said assuming the damages would survive, but the other claims would be moot, would they not? Well, when you say other claims, we're talking about claims that would lead to declaratory injunctive relief as to future conduct. Well, I think that we saw in the religious exercise cases, Brecht actually makes this clear. Brecht and the cases cited in Brecht talk about how the religious freedom cases decided created a precedent, which in part is the reason why there can be more assurance against these kinds of orders that violate constitutional rights because there's a precedent in place that shows that, look, these rights have to be respected for what they are regardless of the conditions of the pandemic. At a minimum, you've got to at least try to accommodate them with less restrictive alternatives. So I think that this case is like that in the sense that if this court were to decide the matter and not demand it back for further proceedings, you could accurately and reasonably come to a conclusion that a determination along the lines of similar to that, where there is a recognition that these rights must be respected that could be in the form of some kind of injunctive relief or declaratory relief as to future conduct. But wasn't that precisely the posture of Brecht? The plaintiffs claimed that they had a constitutional right. The court never reached the issue and said it's clear that it's not going to recur, and therefore your claims are moot. At the very least, shouldn't we get to the district court and determine whether or not to have a pledge of allegiance? That is one way to handle it. And, Your Honor, to your point on that, there are clearly distinctions in this case from Brecht insofar as the factual circumstances that led the court to conclude there's a low likelihood of a recurrence here, legislative changes, clear declarations on the books and publicly made about how they're not going to do this again, a statute even that mandates penalties against schools who fail to comply with the in-person learning process. We don't have any of that here. Counsel, help me on something relating to that. I guess I have two questions that relate to that. One is on the mootness, I can't help but notice that the number of cases is now going up, and they've had big increases in case numbers in Germany and in Israel. And I don't recall anything in the pleading that said that the county had said we'll never do this again. Is there anything to stop the county from deciding to impose these restrictions again? I don't think so. I mean, they haven't reimposed them, that's true, but there's nothing to stop them from doing so. Do they promise not to do it again? No, they definitely have not. And my other question is, we've talked about the length, how long the restrictions lasted. Looking backward, I'm curious, was there anything when the restrictions were imposed, when Dr. Levin said you can't do anything, you can't go out of your house, you can't live your life in any way outside your house, which includes no nonessential purchases, and it was nonessential in his view, did anyone know how long that would last when it was imposed? Definitely not, because the orders were said over and over again, including the most recent of them, that they could be rescinded, amended, changed at any time. Didn't they also say that they could be renewed at any time? Absolutely. So for all you knew, you'd never be able to pick up the gun you'd bought, or you'd never be able to buy the gun you thought you needed, or you'd never be able to get ammo for your gun. When the orders were imposed, you just found out later, oh, thank goodness, I can go to the store now and get what I need. That's right, Your Honor. That is true, then. Let me ask you one other thing that's been bothering me. At least in my town, the best gun store is actually in the best hardware store. Well, I think they're the best. If that hardware store were in Ventura County, would it still have been able to sell the guns, because it had all these essential things that Dr. Levin allowed, like if your plumbing was leaking, you could pick up the pipes and the plumbing tape and all that stuff, so you'd still be able to buy your gun there, or would they have to, under his order, close the gun counter but leave the hardware store open? I think the way that you'd have to read the orders is that you would not be able to sell firearms or ammunition there, because the orders were specific as to the types of products that could be sold and the places that could have to open. How is that thought to relate to COVID? I mean, you're milling around in the store and waiting in the checkout line, whether you're buying some PVC pipe or whether you're paying for your ammo. Did we know? Sorry. Was there any rationale offered for that? No, there wasn't, Your Honor. And significantly, unlike the Bragg case, there was not only no reversal or declaration or legislative change, but there's instead, as we've seen through this litigation, a doubling down by the county of its position in going so far as to say these are essentially unnecessary, because anything less restrictive wouldn't have been acceptable. But they don't explain how or why that's true when there's no evidence or indication or even any argument that these retailers of firearms and ammunitions or shooting ranges created more of a risk to anybody in the spread of COVID when they could have followed the same safety protocols as everybody else. But your point, like it's more likely, maybe not the hardware store, but in California, the Walmart, for example, which often has gun sales. But again, that would be a matter to be developed for the record one way or the other, wouldn't it? I believe so, Your Honor. And we do have in the April 20th order, which is the one that expressly states that firearms shops are closed and have been required to close and must remain closed, they specifically list gun shops among the stores that must be shut down. But you're right, as again, the general premise that we are, the posture here is very important to keep in mind. And we're just looking at it from the perspective of the allegations and taking it as true. This is Judge Friedland on video. Can I ask you a question about the limits of your argument here? So I understand that you're trying to use the free exercise cases to extend to Seventh Amendment rights now. And I'm wondering if the same would be true of First Amendment rights to attend a library of marriage rights, to have the county office be open so you can get a marriage license, of familial association rights so that you can join with households and your cousins and your grandparents. Wouldn't the shutdown orders have affected all of these rights? And is the implication of your argument that a public health emergency could just never have a shutdown order? I wouldn't take it that far, Your Honor. I understand your concerns. I think that the shutdown orders had impacts across a whole spectrum of rights. And as to the rights that were violated, those whose rights were violated have a righteous case to bring a claim. In that regard, we're dealing with our set of rights here. I don't think we have to take it to an extreme, though, as you've articulated, because what we're looking at is, again, this set of rights and... Well, do we have case law that says this set of rights is more important than marriage or family or First Amendment speech? Not that it's more important, but that it's as important. And so if it's as important, then why wouldn't your argument mean that nothing could really be shut down or so much could not be shut down that we would never be able to deal with a public health emergency? And we're not really even saying, I don't think, that nothing could ever be shut down and no restrictions could ever be in place. The argument is that the violation stems from the fact that there were less restrictive alternatives available readily. So less restrictive alternatives are in retrospect, right? I mean, at the time, no one really understood how COVID was transmitted. No one really understood if outdoor was better than indoor. So in this short period of time, in the first weeks of COVID, the government did the best it could to protect people. And maybe in retrospect, you can say, oh, they could have done that better. Now we know that outside is better than inside. They could have had fire ranges open, but that wasn't clear at the time. So I don't know how we could agree with you without really hampering the government in a future public health emergency. I have to say, in this case, it's important to note that they were aware. The government was aware of the less restrictive alternatives readily available because in their orders as they progressed across the weeks and months, they extended reopening to certain industries and certain businesses as long as they followed the safety protocols. They were very aware of the protocols that were available and the things that would stop spreading of the disease and how it could be used in a business that was no different functionally from a firearm shop or an ammo shop or a golf course that allowed people to come play golf again. But Council, let me back up. Golf is way more spread out than a firing range, right? I mean, you could be by yourself on a golf course. It's hard to be by yourself in a firing range. Sure, but we're talking about hardware stores and bike shops and automobile centers where you can buy and sell cars and bikes, not necessarily for something related to work, but for any reason. So, let me kind of follow up on what Judge Friedland is asking. So, God forbid, there's another pandemic that we've had and been struggling with. But when there is a county or a city or the state government to take into account every enumerated right before they issue their guidance, First Amendment or Second Amendment, I know you're here on this case, but what you're asking implicates others' rights, enumerated rights under the Constitution. So, is that what we're – would we be affecting how a county takes health and public safety into account during a pandemic by making sure that whatever guidance they give doesn't trample or step on somebody's either first, second, or any other right? I think that each case would have to be looked at with its particulars and especially – So, the answer to my question is yes. Yes, insofar as we have to look at what the governmental entity considered as far as what was available that was less restrictive in nature if they had it readily available. That's all we're really saying. But that's a lot for a county government or any other government to take into account, isn't it? I don't think that it is. If we look at this case in particular, the way that the orders came out, even though you had on March 28th that memo from the Department of Homeland Security which said that these industries are part of the critical infrastructure, each order that followed specifically excluded gun shops and while extending it to other shops that didn't function any differently. So, they were aware. They didn't explicitly exclude it. They just not mention gun shops for most of the early orders. They didn't mention them up until April 20th, but then they clarified April 20th that this had applied way back to March 20th. Well, but at that point, it doesn't matter, right? I mean, at that point, when they do mention them for the first time, they let them partially open. They let them partially open just to complete sales that had already been initiated. Yes, but nothing – Counsel, can I ask you a question about this? I think the strength of your case comes from the inconsistent nature of the orders covering some places, not others. So, I want to ask you a hypothetical so you don't have to tell me this is the case. What if the orders had simply shut down everything until everyone they had to remain at home were self-specified or unspecified? Would you still have an argument? Doris, I understand your argument based on discrimination. Trying to figure out whether or not – this goes to Jeff Friedman's question. Whether or not the county has the power for some period of time to sustain everyone. Stay home. Don't go out. There are no non-essential industries or perhaps a way to get food. But we're not going to let bike stores open or hardware stores open. This is a blanket across the board order. Would that violate the Second Amendment? I think that it could, just as well as it could First Amendment rights and other freedoms, depending upon other factors we're not aware of. But I think that it could. Well, we get into Jacobson territory there. That's what I'm worried about. The Supreme Court has seemed to say public health abilities of state and local governments are fairly broad. I know they can't do it forever, but it seems to me that in the absence of discrimination, perhaps with a shorter time period, I'm not sure why Second Amendment rights would violate the right to stay at home. Well, I think that the key point that you mentioned there was in the absence of discrimination. If we look at the religious exercise cases, including Calvary Chapel from this court, the only thing that was alleged in support of the claim that there was disparate treatment and a lack of neutrality and, therefore, strict scrutiny applied was simply the disparate treatment between the indoor religious services and bike shops and motels and other businesses. That was it. And this court accepted that as being sufficient to establish a lack of neutrality. Can I ask you to? I'll start it off by saying I think that's the strongest claim I'm trying to explore, but as Judge Friedland requires. Can I ask a question on the text history and tradition? If we were to look at the text and tradition of this, and perhaps Bruin will change the analysis or the test we're supposed to apply, but would we go to Jacobson and analyze it under Jacobson? Does Jacobson provide that context for the history and tradition in a pandemic, or do we need this request supplemental briefing on every pandemic in the last 200 years, and what's the history of Second Amendment rights and how were they treated? I don't think so, Your Honor. Taking it to that extent, Jacobson, if we look at that, it's later cases have clarified, including the Supreme Court, that it does not control in a situation like this. That instead we're supposed to look at the test that applies to the particular right in question. I mean, text history and tradition, that as we see in the religious exercise cases, they focus on the nature of the right. They didn't focus on Jacobson pandemic nature of the right. Well, are you saying that here, I'm just, that where the restriction is so severe that it's to be categorically unconstitutional rather than being subject to strict or intermediate scrutiny? Are you just saying it was so severe that that's the basis? I think that that's definitely true, but we could use one of the more lenient tests and get to the same place. If the court finds that intermediate scrutiny is what it must apply, it just needs to adhere to what intermediate scrutiny would actually require of the government insofar as burdens are concerned and less restrictive alternatives in order so that the government can't just have a free pass and say, oh, this just makes it easier. I mean, on Jacobson, too. Let me just ask you on that point, my understanding from what you said at the outset is, were we to get into that situation that intermediate scrutiny applies, you would still need to go back to the district court for application with evidence, right, so that we're not talking hypotheticals and we're not talking what's in or out of the complaint, which is not much is in the complaint. So doesn't that put us right back to the district court? I agree with you, Your Honor, and I'm trying to be sensitive in responses to the questions, but a lot of them do tend to get into these merits-oriented issues. And so to be responsive to that, yes, I can respond to it, but I do think that fundamentally what you're saying is right. Is there a distinction between a government announcing a permanent ban versus does stay-at-home orders that are, to Judge Kleinfeld's point, indefinite, but is it an announcement that people will never be able to buy guns in the future? Do you draw a distinction in those, or are they similar enough that you don't see much of a difference in burden? I think given that we have orders here which were subject to discretion and the power of the county to just enact or take away or extend or modify as much as they wanted, it's pretty much the same thing in that whether it's a day or 48 days or forever or whatever it means, if it's indefinite and can be renewed, no declarations of an intent to not do it again, no legislative changes to limit the power associated with this, no commitment to even say we'll try less restrictive alternatives first next time. It's really functionally not different. Would it have mattered if it was indefinite but it only lasted two and a half weeks? I don't think so, Your Honor, because when we put those types of boundaries on it, we just get away from what really matters. We have to look at what the government's justification was. There was zero justification or evidence as to why this was necessary or useful or even preventative given the less restrictive alternatives of being able to use safety protocols like every other business that was there. There was zero evidence. We don't have anything here that supports anything related to guns specifically that has been used in the past to uphold constitutional restrictions or restrictions as constitutional in the Second Amendment. There's no justification at all. And that's what's so struggling about the position of the county and about where we are with the rationale and the extent of that, the government's rationale. I only have 36 minutes. We wanted to reserve a little bit more, and I'll give you a couple more minutes, but thank you for coming. Thank you. Thank you. Thank you. Good morning. May it please the Court. Christine Brinson on behalf of the Ventura County Appellees. The Ventura County Health Orders temporarily closing nonessential businesses during the early days of the COVID-19 pandemic did not violate Appellant's Second Amendment rights. Appellants ask this Court to take an unprecedented position and apply strict scrutiny to these spatially neutral county health orders. Would you concede that rational basis doesn't apply, or are you leaving that on the table? We're leaving that on the table. At most, strict scrutiny does not apply here. But rational basis still could? And if this case goes back down to the district court for further analysis and to flesh out at a summary judgment position, I think rational basis is still on the table. And Jacob said it's a front. It's always a front. It's a front. But also, we contend that intermediate scrutiny would be applicable here. And as this Court recently reaffirmed in Jones v. Ponta, that intermediate scrutiny applies to laws like the health orders that merely regulate the way that people can obtain or use firearms. Counsel, go ahead. I'm sorry. Judge Gallagher, go ahead. Oh, I guess that's a little bit. I'm trying to – your colleague on the other side, as I'm not going to comment on this, that you're both colleagues. But he raised the parade of horribles about how Ventura had dug in and they were taking no prisoners. And what you're saying is you're pretty much leaving everything on the table and you'd do the same thing again. So I'm trying to assess if his parade of horribles is really the reality on the ground. What's important to remember here with the health orders is that the health orders only limited a small portion of Ventura County residents to purchase guns for a limited time. It did not ban or address any other lawful means of obtaining firearms during that time. Hold on a second. I want to press you on that point. You said a small portion of the citizens were prohibited from buying guns. That's your position? What I was trying to clarify is that this is not like the other gun regulation cases that this court, the Supreme Court, or other circuits have dealt with. What this is is a limit that limited the ability to purchase guns during a particular period of time. Well, it's different because somebody could have had a gun at home. But you would agree that the orders on their face prohibited all residents, initially 75 and older, and then three days later, everyone from purchasing any guns, even if they put in their order beforehand. Then 40 days later, they finally say, okay, well, if you ordered it 40 days ago, we'll let you get it. But you don't disagree with those facts, correct? I don't disagree for that period of time that you were not able to purchase a gun in Ventura County. But as I'm trying to use that. Can I follow up on that if I can? I mean, Judge Elson, I think, points out quite clearly that there was a burden placed on Second Amendment rights during this time. If we were to apply intermediate scrutiny, any other level of scrutiny, I'm interested in what your friend said, and I think he's right. There's nothing in this record under which the county came forth and said, because it was a motion to dismiss perhaps, here's the reason we let bicycle shops open, not gun shops. Here's the reason hardware stores were allowed to open, but not gun shops. Here's the reason you could go to a golf course, but not a shooting range. Don't you have to come forward and act Second Amendment rights? Something we're at a rational basis, but we have to make those decisions. Don't you have to come up with the reasons? And I don't see those reasons in this record for the kind of hodgepodge policy, if you will, that you described. Am I wrong in thinking that you didn't offer any reasons? Were these distinctions? Well, Your Honor, I disagree that the record does not have some of those facts in there. For instance, in the record on 137, it talks about how, on the April 20th order, why they allowed in-person gun sales to occur that started prior to March 20th, was because, unlike bike stores and other places where only online purchases, and the record's clear on that, only online purchases of bicycles were allowed during that time. And because they couldn't do that on how you obtain the laws in person. That's what I'm asking. I understand that you listened to restrictions and so forth. My question is, at a point when you entirely banned gun stores from opening for people from going there, what rationale was offered for leaving hardware stores open? What rationale was later offered for opening golf courses and not shooting them? You may not have had that opportunity because of this motion to dismiss, but it seems to me if we're operating in even an intermediate scrutiny area, it's the burden of the government to offer the justification and to show the fact, rather than for us to try to imagine what it is. So I'm asking, did you do that? Well, Your Honor, you're correct. At the 12B6 arena that we were at when this motion to dismiss came forward, we are unlimited in the record and facts that were set forth. Assuming that's the case, then why isn't Judge McEwen's suggestion correct? Doesn't this complaint state a claim upon which leave can be granted? Shouldn't we send it back to the district court to address it? Certainly the court could send this back to the district court to flesh out. I know we could. I'm asking whether we could. We could do all sorts of things that might be wrong, but I'm asking whether we should. Yeah, I think the court could still rule on the merits of this case here and uphold the district court even applying strict scrutiny based on the record that we have here. Well, that's why I was going to ask you a question. You never offered a justification about the fact. You mean in that case? In that case, you are correct because you have an opportunity to do it with a motion. You said so. I would make a pretty close fit. I'm sorry. You cut out a bit, and I'll try to answer the best that I can. Intermediate scrutiny does not require the county to show that it was the least restrictive means, and if you look at the health records, health orders that were in the records, they stated that based on the evaluation by the health officer of the unique needs and circumstances existing within the county, these orders were set forth. Now, there was also, and it's in the record, the state health order was in place, and then on May 7th, when the health officer, Ventura County health officer, determined that there no longer exists a need for the local health orders to be more restricted than the state orders, the Ventura County health orders mirrored the state orders. So, Ventura by health and safety code was just following the state orders at that time. Let me ask you, with respect to gun sales, unlike bike sales, my understanding is that has to be in person. You can't order it over the Internet because you need this mini safety course, which you have to do in person. Does that cut for or against your position? Well, I think it cuts for our position and why other businesses were able to conduct online sales like bicycle stores that are in the record and that those orders had to be delivered to their home or an essential place of business, whereas gun sales had to be done in person. And it's to remember that this was the very early stages of the pandemic when we did not have readily available testing. We did not know how it spread. We did not know how far social distancing at that time was required. There were no vaccines. Can I push back on that a little bit? That might be true for the early stages. But by March 31st, the Department of Homeland Security had said gun shops are an essential business that needed to be opened. And you still kept this in for another 20 days. So, I mean, I understand that for a week, 10 days, that's a different case. But it seems like at every opportunity, at four or five opportunities, the county was given an opportunity to take constitutional rights into account and they refused to do so. So how do you defend that? Given what the record reflects and should this court send it back down to the district court for further briefing, that the record and the health officer monitored the situation as it pertained to the county. And while there was an advisory opinion about whether gun stores were essential, that was only advisory, and it was left up both by the federal government and the state from county to county, city to city, to determine based on the facts in their county to determine what was safe to do so. But at that particular time, even on March 30th, there were no vaccines. There were very limited testing. There was no known cure or treatment for the disease. Your position is no one should have been allowed to buy a gun until there was a vaccine? No, what I was saying – Well, that's what you said. You said there were no vaccines and therefore it was justified. So the flip side of that would be you could live a second memory rights until there was a vaccine. Is that really your position? That is not the position that I was making. What I was making is as early stages and as the Supreme Court in the Diocese of Brooklyn v. Cuomo gives great deference to state and government entities in managing their public health crisis. Counsel, I have a couple of questions. First of all, when you answered the questions raised by my colleagues about the level of scrutiny, whether it should be rational basis, intermediate scrutiny, or strict scrutiny, I understood your rejection of strict scrutiny. I did not understand whether you were saying that intermediate scrutiny applied or whether you were saying that rational basis scrutiny applied. Are you conceding that there should be intermediate scrutiny or are you arguing that rational basis scrutiny should apply? I would argue that even under intermediate scrutiny that the health orders were still valid. Go ahead. That should the court decide to analyze this under a Jacobson framework and to touch on the text history and tradition approach that was asked of my colleague, I think that you would be able to uphold both under the text history and tradition. So you're saying you went even under rational basis scrutiny. You think you also went under intermediate scrutiny. Have I got that right? Based on the facts under what we have now, yes. Now my other question. I was intrigued by Judge Friedland's question to you and I'm curious about whether I'm drawing the right inference about the answer. You've argued a lot from the ignorance and lack of treatment at the time that the restrictions were imposed and Judge Friedland asked you whether any restrictions would be invalid or asked your colleague whether any restrictions would be invalid under his argument. I'm curious. Suppose that Dr. Levin had issued a restriction based on what Shanghai, China did. Everybody stays inside no matter what except a few people who do food delivery and such and they don't get to go home. They live in a camp or something and doors will be welded shut. So everybody stays inside and I think you would say or your argument would imply that under Jacobson that would be all right and it would avoid the disputes about whether you could draw the distinctions between say gun rights and the right to go to the grocery store and buy what you want. However, I'm thinking Jacobson came down before any of the I think it came down before any incorporation of rights, certainly before most rights were incorporated against the states. Would it be correct that Dr. Levin could have ordered total stay at home without an exception for what he felt were essential activities and that would eliminate all the disputes about balancing this and that and special scrutiny for constitutional rights. Could the county have just restricted all activities and not made these exceptions for what are thought to be essential? I don't. That's not what's before the court now. No, it isn't. It's a hypothetical. I know it's not the case before the court now. It's a hypothetical case. What I want to know is, under your argument, why couldn't the county issue an order that did not have an exception for essential activities? What's important to remember is that there was also a stay at home order  and while it took portions of that and tried to define it. Avoiding my question now, I want to know whether Dr. Levin could have just copied the order out of Shanghai and said this is what will protect people the most from catching COVID. With the facts that we have here, is it possible? It's possible, but did it happen and is it in the record now? No, it didn't happen. It's a hypothetical question. I'm trying to find out how far the rationale of your argument would lead us. It would depend on how severe or what the particular parameters were that would require it. And standing here today, did that happen? No. Is it possible that something worse than COVID could come in the future in the next 3,000 years? Is it possible? Or the next three years? Hopefully not. Counsel, let me clarify your position. You indicated that even if we decide that intermediate scrutiny applies, the county would still win. Are you saying the county would still win on this record that we have before us or to be mandated for further justifications and evidence? Does the county have further evidence and justifications to proffer in that analysis? The record that we have here and what the health orders say and the reasoning backing them, I think there's enough where the court could rule on that issue under intermediate scrutiny and find that the health orders do not violate appellant Second Amendment rights. However, if it was sent back to the district court, there, of course, would be declarations that we would attach, setting forth the basis like we did with all the other COVID litigation as to why the orders were in place for various other lawsuits. So, yes, if it was sent back, that would be our next round at the summary judgment level. Counsel, can I follow up with that? I'm struggling to figure out how that could be because was there any evidence in our record that the county contemplated potential mitigation measures for gun stores or firing ranges or thought about extending the appointment-only process to other gun sales? Is there anything that would suggest a more calibrated approach by the county with respect to the claims that are praised in this case? Well, I think what the record reflects is that on various times from March 20th, April 8th, April 20th, when the health orders opened up gun sales to allow gun sales in person for sales that started prior to March 20th, it shows that in the record that it was contemplating that the county did look at that and that on April 20th it opened up for sales in person, despite the record showing that it did not open up in person for other stores. I'm just asking you to infer from the fact that it did extend the appointments to those who it's bought earlier that somehow health-wise it would be different for extending appointments to other individuals. I mean, doesn't this boil down to there hasn't been any fact-checking because it's at its OP-6 stage? It's hard for me to see how we can infer different health consequences for things that don't seem apparent from the face of the complaint. And you're correct that because of the nature and where we are in the pleading stages in the motion to dismiss, that those additional facts have not been developed as it would be in a motion for summary judgment. Mr. Rancho, you've described the measures here as temporary, but on their face they don't have any limit to their duration. It so happens that after about a month and a half they were modified, but that's true of any legislation that if it happens to be repealed or amended, then you can look at it ex post and say, well, it proved to be temporary. So why, in the sense that would be relevant to our level of scrutiny, why is it appropriate for us to view this as a temporary measure? Because the record shows that the health orders were consistently being changed and then on April 20th allowed to open up for in-person gun sales. Also on April 20th interstate commerce was also allowed to reopen. But what you also see in the health orders, this is not a, this is not a, it does not tell you what gun you can own. It doesn't tell you what type of ammunition you can purchase. It's unlike the religious cases that my colleague has raised because, as the Supreme Court pointed out in those line of cases, is that in order to exercise that right, you had to do that in person at the synagogue or the church. Here we didn't. But in terms of the duration, I mean, we all acknowledge that on April 20th it was eventually amended, but when it first went into effect, somebody looking at that, looking at the order would have had no way of knowing whether it was going to last a week or the next three years, right? So why isn't that the right perspective from which to look at it? And from that perspective, it seems not temporary at all. At the initial stages of the first order, I would agree with you that it did not expire until it's amended, repealed, et cetera. But what our record reflects here and shows is that those orders were amended. They were changed. And this was a health order. This wasn't a health order that only banned guns. This was a health order that was put in place for the benefit of the county to keep everyone at home to the greatest extent possible. And as the record reflects, that was done so in order to do contact tracing. Well, would it stop you from just putting the orders back into place? I mean, I don't understand your answer to that question. What tells us that this isn't going to happen again? Well, for the record, that it hasn't been in the 26 months that since the orders have been put in place that anything like that has been put in place, and that nothing was prevented from no health orders were put in place to close gun stores when the Omicron variant ticked up or there is, you know, the hospitalizations increased or the death toll rose, Ventura County did not put in place any other health orders. We simply followed the state guidelines and the state health orders. Ms. Henshaw, what is the correct framework for analyzing these orders? Do we look at the burden, potential burden of the Second Amendment order by order, or do we look at them collectively until there is no more order? I think you would look at it per order, collectively for the orders and on the record, and the burden that it would place on a particular right. But I'm totally confused by that. You look at it order by order, and then you said collectively. So, in terms of analyzing whether, for example, there is a damages claim if the case goes forward, would you determine, like, the first 17 days that the person couldn't buy a gun, or would you look at the diminished restrictions, or would you just say from the beginning of COVID restrictions until they were completely lifted, that's the framework? How should it be analyzed? I think for the damages claim, if the health orders were found to have violated, which, of course, we contend they do not, it would go back to the beginning of the health orders and look at whether there's a constitutional violation. How do you analyze that, given we have so many orders? I think you'd have to look at the health orders in totality and analyze what burden it placed on Second Amendment, if any. Counsel, help me with something else, and I'm sure you've thought about it, assuming you've read the concurrences as well as the majority opinion from the panel. My concern that I raised, you undoubtedly noticed, was that all the county was really giving us was that the order furthered a legitimate government purpose of reducing the spread of COVID, but the county did not show us a reasonable fit between the restrictions and the order and the legitimate government purpose. And I gave as an example, could the county ban Mexican restaurants but allow French restaurants? I think anywhere but maybe the wine country, there are a lot more Mexican restaurants than French restaurants, and it would further the government purpose of reducing the spread of COVID, just because there are more restaurants, so there'd be more patrons and staff who might catch COVID. So, under your argument, I think the county could ban Mexican restaurants, but not ban French restaurants, is that true? I'm sure you've thought about it a lot and you understand it's hypothetical. I'm not sure we have any French restaurants in Ventura County. I would, they're hypothetical. If those were determined to be super spreaders or a larger outbreak area, I'm sure that that is something that could possibly be done. Wouldn't you have to under those circumstances? It's not just my fault for asking hypotheticals, too, because it appears he has as much trouble in answering to the decisive, but under those circumstances, wouldn't you at least be required to come forward with some evidence that French restaurants were super spreaders and Mexican restaurants were the opposite? Yes? Okay. Not at the level that we're at here to 12B6? No, no, before your restriction were L, let's assume the Mexican restaurant said, you let the French open, but not the Mexicans. Wouldn't you have to provide a reason? I'm not sure that we would at that level for a number of reasons. See, that's what's troubling me here, and that's why I find your answer difficult. At some point, you said in these orders, we'll allow certain businesses to be open, but not gun shops. And the plaintiffs are saying that violates the Second Amendment because we have a Second Amendment right to obtain firearms. And I guess my question to you is, don't you have to say why? We'll have some businesses open and not others, other than the mere fact that a doctor thought it was a good idea. Don't you have to justify the distinction? And I think what's important here and why the Supreme Court acknowledged the deference due to states and government entities in their management of public health is because in the brief period of time that these orders were in place, you know, bookstores were closed. There was a number of other businesses that were deemed nonessential, not just by the county but by the state, which were closed. And that there were certain businesses allowed to reopen that supported the infrastructure, the critical infrastructure that was laid out by the state orders, which are in the record, and that they were allowed to reopen because of the sales only for online sales only, and that is reflected in the record. So I have a non-hypothetical follow-up to Judge Hurwitz's question, which is if we were to remand and say that the plaintiff civilly stated a claim and that there needs to be some factual development of the justification for this order, can you sketch out for us what you might anticipate presenting to the district court  and in particular the justification for some of the distinctions between different types of businesses that have been discussed here? Sure. Well, we'd start with the state order and what the county was supposed to follow, and some of the order clarified what the state order was, and also the declarations of our health officer as to why these decisions and the evidence that supported them, the numbers that were in effect at that time, the numbers of deaths, infections, the rates, the ability to maintain the health care systems, which was a big issue at the very beginning of the pandemic. That all sounds like it goes to sort of the general need for some kind of COVID control measure. It doesn't really address why some businesses are more of a problem than others. What it would lay out is why other stores and businesses that were open to allow online sales, and it would draw the distinction between those businesses such as bike stores that help support the critical infrastructure and allow people to get out and use their bikes for various, you know, to commute to work or to get their groceries, because those were allowed online, whereas gun sales were not. You cannot conduct a gun sale in California online. Those have to be done in person. And so those would be the distinctions that would be laid out. So I guess I'm understanding your view to be that at 12B6 you can say just because we say so, and later then you have to justify. No, that's not what I'm saying here. I think in the record there's enough in there where it does lay out some of the reasoning and basis for it, but also the fact that this. Any of the things that you just talked about? Yes. Can you direct me where I should see that? Yes. In the excerpt from record 119, 120, 134, 157, 132, 137, which specifically talks about the allowance for completion of firearm sales and why the in-person was allowed as opposed to online only because you cannot sell firearms online. And that's in the record. Also on 148, the travel for interstate commerce as well. Thank you. Are those citations to evidence or to arguments that you made in various briefs or memos or what? No, that's in the excerpt of records to the health orders. So what you're citing for the justification is the health orders themselves? And those are the citations and those are the pages that address the issues that I was asked. Okay. Thank you. I don't know if you want to make a concluding statement. I'll let you. At the very least, intermediate scrutiny. Pardon me. The Ventura County health orders temporarily closing all non-essential businesses, including gun stores, did not violate appellant's second amendment rights. Appellants are asking this court to take an unprecedented position and apply a stricter level of scrutiny to a non-facially neutral law that has never done so before from the Supreme Court, this court, or any other court. Thank you. Thank you. I'll give you two minutes. Thank you very much. That's very kind. I think initially we should just be sure we're right on the facts here because a lot of what my colleagues said indicated that everything that was being sold was online, except for gun stores, including bike stores and auto shops, and that's just not true. There, of course, were many, many stores where there was in-person, in-store shopping. I mean, a huge variety of them, including the bike stores and auto stores. ER 153, that specifically, the April 20th order, specifically says that in-person sales are allowable. But, of course, those are just two of the many that were allowed with no explanation while the gun stores were just required to remain closed. The reality is that the progression of the orders, which my colleague cites as some sort of evidence of monitoring and some sort of evidence of a, I don't know, taking care of rights, shows quite the opposite because it shows that they were aware of the less restrictive alternatives and yet actively chose each time not to extend it to the firearm stores and shops with no justification, given that the basis of the whole of the orders was stopping the spread or controlling the spread of the disease. The rationale goes to cover every single business out there. You really could have whole city blocks that are completely closed on that basis, and it wouldn't matter what kind of rights were impacted under that kind of rationale. The other thing, too, is that in the briefing, they can see that McCullin actually applies. In the McCullin case, it's the one that makes clear that under injury scrutiny, you've got a real burden there, including to show that it's narrowly tailored, that there are less restrictive alternatives, which these things have real teeth, and they admit that that applies, and yet now they're coming and saying, oh, it's probably a rational basis, or if it's injury scrutiny, then it just can be because we say it makes it easier for us. McCullin specifically rejected the it makes it easier for us analysis for that claim. So I think that this is a plausible case for a Second Amendment violation, which is all we need to state at this point, and therefore we would ask for a reversal. Does the court have any more questions? Thank you. Thank you, Mr. Sabine. Ms. Venshaw, thank you very much for your oral argument and presentations here today. The case of Dugal versus the County of Ventura is now submitted. We are adjourned. Thank you.
judges: MURGUIA, KLEINFELD, McKEOWN, CALLAHAN, NGUYEN, HURWITZ, FRIEDLAND, NELSON, MILLER, SANCHEZ, THOMAS